**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CIVIL SERVICE EMPLOYEES**
**ASSOCIATION, INC., LOCAL 1000,**
**AFSCME, AFL-CIO; HATTI LANGSFORD;**
and **KRYSTAL BULLOCK,**

                    **Plaintiffs,**             **1:08-cv-440**
                                             **(GLS/DRH)**

        **v.**

**NEW YORK STATE DEPARTMENT OF**
**PARKS, RECREATION AND HISTORIC**
**PRESERVATION,**

                    **Defendant.**
_____

**APPEARANCES:**              **OF COUNSEL:**

**FOR THE PLAINTIFFS:**
Civil Service Employees Ass'n Inc.    MIGUEL ORTIZ, ESQ.
143 Washington Avenue           NANCY E. HOFFMAN, ESQ.
P.O. Box 7125, Capitol Station
Albany, NY 12224

**FOR THE DEFENDANT:**
HON. ANDREW M. CUOMO      ROGER W. KINSEY
New York State Attorney General   JAMES B. McGOWAN
The Capitol                    Assistant Attorneys General
Albany, NY 12224

**Gary L. Sharpe**
**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiffs Civil Service Employees Association, Inc., Local 1000, AFSCME, AFL-CIO (CSEA), Hatti Langsford, and Krystal Bullock commenced this action against defendant New York State Office of Parks, Recreation and Historic Preservation (OPRHP) under Title VII of the Civil Rights Act of 1964,[1] alleging employment-related gender discrimination and unlawful retaliation. (*See* Compl., Dkt. No. 1.) Pending are plaintiffs' motion for partial summary judgment, (Dkt. No. 22), and OPRHP's cross-motion for summary judgment. (Dkt. No. 27.) For the reasons that follow, the court (1) denies plaintiffs' motion for partial summary judgment and (2) grants OPRHP's motion for summary judgment insofar as CSEA is dismissed from this action but denies the remainder of the motion.

## II. Background

### A. Factual History

Defendant OPRHP is a New York State agency that operates Minnewaska State Park in Ulster County, New York. (*See* Pl. SMF ¶ 1, Dkt. No. 22:3.) Minnewaska is part of the Palisades Region of OPRHP.

---

[1]42 U.S.C. § 2000e, *et seq.*

(*See id.*)  From December 1, 2005, to July 1, 2006, Michael Krish, as

Minnewaska Park Manager 3, supervised Minnewaska's employees, which

included directing their daily work activities and recommending disciplinary

measures.  (*See id.* at ¶ 9.)

Plaintiff Hatti Langsford began her employment for OPRHP as a long-

term seasonal employee in 1994.  (*See* Pl. SMF ¶ 5, Dkt. No. 22:3.)  During

her employment, Langsford worked at Minnewaska as Assistant Park and

Recreation Supervisor and as an Environmental Educator, which required

her to provide educational programs to the public and oversee volunteers

and the Student Conservation Association.  (*See id.* at ¶ 6.)  Langsford

also received training for and served as a sexual harassment prevention

and diversity trainer.  (Pl. Reply SMF ¶ 6, Dkt. No. 32.)  Plaintiff Krystal

Bullock, who also worked as a seasonal employee at Minnewaska, began

her employment in 2002.  (*See* Pl. SMF ¶ 7, Dkt. No. 22:3.)  Bullock was

promoted to maintenance in 2004, and then to Park Ranger in 2006.  (*See*

Def. SMF ¶ 65, Dkt. No. 27:3.)

According to Langsford, in Fall 2005, Krish reorganized the positions

at Minnewaska by assigning the maintenance positions to the male

workers and the gatehouse duties to the female workers.  (*See* Def. Ex. 7,

3

Dkt. No. 27:7.)  In response, Langsford voiced her complaints directly to Krish, telling him that it "looks like [he is] trying to make an all male workforce" and "[i]t looks bad."  (Def. Resp. SMF ¶ 21, Dkt. No. 27:2.) Krish reported Langsford's statements to, among others, the Palisades Regional Manager, Jayne McLaughlin.  (*See id.* at ¶ 21; *see also* Pl. Reply SMF ¶¶ 10, 21, Dkt. No. 32.)  McLaughlin relayed the statement to Mary Thomas, the Palisades Region Affirmative Action Officer.  (*See* Pl. Reply SMF ¶ 21, Dkt. No. 32.)  As a result, Thomas contacted Langsford and suggested that she file a formal written complaint.  (*See id.*)

On November 18, 2005, Langsford filed an internal written complaint of discrimination with OPRHP against Krish.  (*See* Pl. SMF ¶ 20, Dkt. No. 22:3.)  In her complaint, Langsford stated that Krish had created and was continuing to promote a "hostile work environment" by engaging in "unprofessional conduct," "yelling," and making "jokes [and] inappropriate comments," which caused Langsford's coworkers to make "many complaints" to her as the sexual harassment trainer.  (Pl. Ex. 17, Dkt. No. 22:4.)  Langsford also stated that Krish "is not a good manager and is a mysogynist who has laid off all female employees in non-traditional roles." (*Id.*)  As a result, an investigation took place, though Langsford contends

4

that she did not receive any notification about whether her complaint was received or any explanation of subsequent actions taken.[2]  (*See* Def. Resp. SMF ¶ 24, Dkt. No. 27:2 (citing Def. Ex. 7 at 89, Dkt. No. 27:7).)

On December 8, 2005, Langsford met with Thomas and McLaughlin to discuss her complaint.  (*See* Pl. SMF ¶¶ 31-32, Dkt. No. 22:3.) Following this interview, McLaughlin wrote in her notes that she "felt that the majority of [Langsford's] concerns either had no relation to a sexual harassment issue or were without merit."  (Pl. Ex. 28, Dkt. 22:5.)  Yet, the notes from this meeting also mention that Krish "laid off people who question his authority and his decisions."  (Pl. Ex. 23, Dkt. No. 22:5.) Langsford's complaint was referred to OPRHP's central office in Albany, where Michael Carrasquillo, an Affirmative Action Investigator, conducted a further investigation.  (*See id.* at ¶ 33-34.)  In a conference call held on December 14, 2005, McLaughlin, Carrasquillo, Krish, and Alex Collins, the

---

[2]At the time Langsford filed her internal complaint, OPRHP had a sexual harassment policy and complaint procedure, which provided, among other things, that: (1) "swift, thorough and confidential investigations of allegations of sexual harassment will be conducted on a case-by-case basis and appropriate measures, including disciplinary action, will be taken if the alleged sexual harassment is proven"; (2) "[t]he substance of the investigation will remain confidential ... [and] no party or staff member shall disclose the results of the investigation or parts thereof except when necessary to assist in the resolution of the complaint"; (3) "[w]hen the investigation is completed ... [the] Regional Affirmative Action Officer shall issue a final decision and recommendation in writing to the parties concerned"; and (4) "[t]he complainant will be notified in writing of the outcome."  (*See* Pl. Ex. 21, Dkt. No. 22:5.)

Assistant Park Manager, discussed both Langsford's already existing performance issues and Langsford's recent complaint and the possibility of mediation between Langsford and Krish.  (*See* Pl. Ex. 25, Dkt. No. 22:5.) Specifically, the parties concluded that "the legitimate issues surrounding Ms. Langsford's work performance issues should continue to be addressed notwithstanding the fact that she had filed a complaint (i.e. she should be treated as all other employees are treated)."  (*Id.*)  Following this conference, Langsford rejected mediation.  (*See* Pl. SMF ¶ 42, Dkt. No. 22:3.)  In particular, Langsford claims that mediation was inappropriate because her claim was not personal but rather was asserted on behalf of all the female workers at Minnewaska.  (*See id.* at ¶ 39.)  Defendants counter that by October 2005, Langsford intended to leave Minnewaska unless Krish was removed, making any attempt at mediation futile.  (*See* Def. Resp. SMF ¶ 39, Dkt. No. 27:2.)

During his investigation, Carrasquillo interviewed Bullock and her coworker, Crystal Wilhelm, who both stated that they had observed Krish staring at them inappropriately and had reported their concerns to Langsford.  (*See id.* at ¶¶ 44-45.)  Around that time, Bullock overheard Krish say that "now [he] know[s] who's out to burn [him]."  (Def. SMF ¶ 80,

6

Dkt. No. 27:3.)  Moreover, as McLaughlin's testimony reveals, Krish, while referencing Langsford, said that "people in the past know if they go against [him], they pay."  (Def. Ex. 10, McLaughlin Dep. at 78-79, Dkt. No. 27:11.) During an interview, Collins told Carrasquillo that Krish "treated women differently than he did the men there in the park," that Krish thought "women weren't as capable as men" in operating heavy equipment, and that Krish treated women differently in assigning jobs.  (*See* Def. Resp. SMF ¶ 47, Dkt. No. 27:2.)  Carrasquillo issued an investigation report in March 2006, which included findings that Krish stated at a staff meeting that "women are incapable of working in the park," that at least three employees—but not Langsford—were recipients of Krish's sexually harassing behavior, and that this behavior toward coworkers and subordinates negatively changed the nature of the work atmosphere.  (*See* Pl. Ex. 29, Dkt. No. 22:5.)  However, Carrasquillo ultimately concluded that probable cause did not support a finding of unlawful sexual discrimination. (*See id.*)  Carrasquillo recommended that Krish be made aware of the impact of his comments and behavior and advised OPRHP that "these actions, should they become a pattern of behavior could constitute sex discrimination."  (*See id.*)

On May 3, 2006, Carrasquillo sent a letter to Langsford to notify her of his findings, which, according to Langsford, was the first time she received such notice.  (*See* Pl. SMF ¶¶ 57-58, Dkt. No. 22:3.)  However, it is unclear whether this delay was caused by further work towards a resolution, a lapse of process in the Affirmative Action Office (AAO), or Langsford's absence from the office, which began in March.[3]  (*See* Def. Resp. SMF ¶ 60, Dkt. No. 27:2.)  In the letter, Carrasquillo advised Langsford of his findings and that the findings had been referred to OPRHP management for consideration and disposition.  (*See* Pl. Ex. 39, Dkt. No. 22:6.)  Meanwhile, on April 10, 2006, Cheryle Giroux, Director of Human Resource Management for OPRHP, issued a memorandum to Richard Rose, Director of Personnel and Acting Director of Affirmative Action, and Dennis Hanrahan, a consultant with OPRHP.  (*See* Pl. Ex. 41, Dkt. No. 22:6.)  In the memo, Giroux noted that "[i]t is up to management to determine the appropriate course of action" and, in order to "show appropriate response to the findings and protect the agency from future liability in this matter," Giroux recommended discussing an approach with

---

[3]On March 30, 2006, Langsford went on leave pursuant to the Family Medical Leave Act, allegedly due to the stress she was experiencing at work.  (*See* Compl. ¶ 30, Dkt. No. 1.) Her leave expired in June 2006, after which she resigned.  (*See id.* at ¶ 32.)

8

McLaughlin and advising Krish of the findings and the need to avoid any actions that could be found to be retaliatory.  (*Id.*)  Giroux further recommended monitoring the management practices at Minnewaska closely and that Krish take a "refresher course" in Sexual Harassment and Discrimination Prevention and attend a Supervisory/Management training course.  (*See id.*)  McLaughlin and Fred Williams, General Park Manager for the Palisades Region, met with Krish, discussed the AAO's findings, and informed him about what constitutes a hostile work environment and third-party harassment.  (Pl. Ex. 43, Dkt. No. 22:6.)

   In June 2006, Collins made Williams aware of new complaints about Krish, which included "a widespread dislike of [Krish] due to [his] management style (abrasive, doesn't listen to staff, lies, threatens people, makes inappropriate jokes) and a widely held view that [Krish's] behavior toward female staff members was inappropriate and that they were very uncomfortable around him."[4]  (Pl. Ex. 45, Dkt. No. 22:6.)  And according to Collins, Krish's behavior did not improve.  (*See* Pl. Ex. 47, Dkt. No. 22:6.)  On June 21, 2006, Terri McNeil, Minnewaska Office Manager, telephoned

_____

   [4]Collins elaborated at his deposition, saying that he thought Krish was a "sexist ... [who] looked down on women ... as lesser human beings than men."  (Pl. Exs. 46-47, Dkt. No. 22:6.)

McLaughlin to express her concerns that "female staff members were very uncomfortable with [Krish's] behavior (ogling, touching) and did not want to be alone with him."  (Pl. Ex. 49, Dkt. No. 22:6.)  In addition, as evidenced by McLaughlin's notes taken during this conversation, McNeil stated that "girls don't want to work with [Krish] alone," that Bullock, Wilhelm, and other employees had complained of Krish's inappropriate conduct, that Krish was telling perverted jokes, and that Krish had an inflexible "attitude of his way or no way."  (Pl. Ex. 50, Dkt. No. 22:6.)  McNeil also discussed an episode where Krish held Wilhelm's wrist and caressed her bracelet in front of other employees.  (*See id.*)

On June 13, by telephone, and June 16, by letter, McLaughlin offered Langsford four alternate work locations at the same pay rate.  (*See* Pl. Ex. 51, Dkt. No. 22:6; *see also* Def. SMF ¶ 51, Dkt. No. 27:3.)  During the phone conversation, McLaughlin told Langsford that they had taken administrative action regarding Krish, but that he was staying at Minnewaska.  (*See* Pl. Ex. 51, Dkt. No. 22:6.)  Langsford turned down the proposed alternatives because she claimed that childcare was too expensive, she was offered another job with more money, and because she wanted to stay at Minnewaska but felt that management had not done

anything to fix the problems caused by Krish.  (*See id.*; *see also* Def. Ex. 5, Dkt. No. 27:6.)  Based on her rejection of these offers and refusal to stay at Minnewaska under Krish's supervision, OPRHP accepted Langsford's resignation on June 22.  (*See* Pl. Ex. 51, Dkt. No. 22:6.)

On June 30, 2006, McLaughlin and Williams met with Krish to discuss, among other things, the widespread complaints from both male and female staff members of Minnewaska regarding Krish's inflexibility, inability to listen, inappropriate behavior, and perceived gender bias.  (*See* Pl. Ex. 52, Dkt. No. 22:6.)  At this meeting, Krish admitted that he might do a "double take" depending on the female's attire and, with regards to one particular female employee, Krish stated that he was "not getting anything out of it ... [because] she's not the slickest filly in the corral."  (*Id.*)  And on July 3, 2006, McLaughlin held a meeting with four female Minnewaska employees, wherein each employee voiced her feelings that Krish "did not treat women fairly or appropriately either due to job assignments, scheduling, inappropriate staring, or the woman's physical characteristics." (Pl. Ex. 53, Dkt. No. 22:6.)  These statements were corroborated by the Maintenance Supervisor, Marc Cathcart, who added that Krish followed Wilhelm around "like she is a piece of meat."  (Pl. SMF ¶ 91, Dkt. No. 22:3.)

Cathcart also discussed the manner in which Krish subjected female employees to "captive lunches in the gatehouse," where the female employees were not allowed to leave their station at the gatehouse for their lunch break, unlike male employees.  (*Id.* at ¶ 92.)

On July 24, 2006, upon the conclusion of Krish's probationary appointment as Park Manager 3 at Minnewaska, OPRHP offered him a reassignment to Rockland Lake State Park with the same managerial position, which he accepted.  (*See* Def. SMF ¶ 93, Dkt. No. 27:2.)  And on December 12, 2006, a sexual harassment complaint was filed against Krish by an employee at Rockland Lake.  (*See id.* at ¶ 95.)  Upon the conclusion of this second probationary position, Krish was demoted to Park Manager 2 at Two Rivers State Park.  (*See id.* at ¶ 96.)

In November 2006, Bullock resigned from her position with OPRHP. (*See* Pl. SMF ¶ 7, Dkt. No. 22:3.)  She left Minnewaska for a better-paying position with Mobile Life and because she was bothered by the delayed and ineffective manner in which OPRHP handled the Krish situation.  (*See* Def. SMF ¶ 69, Dkt. No. 27:3 (citing Def. Ex. 8, Dkt. No. 27:9).)

**B.**   **Procedural History**

On June 19, 2006, CSEA filed a verified complaint with the Equal

Employment Opportunity Commission (EEOC) on behalf of three of its female members employed at Minnewaska, including Langsford and Bullock.  (*See* Pl. SMF ¶ 77, Dkt. No. 22:3.)  The complaint charged OPRHP with gender discrimination and retaliation.  (*See* Pl. Ex. A, Dkt. No. 1:2.)  On July 18, 2007, the EEOC found there was reasonable cause to believe that OPRHP "violated Title VII by sexually harassing and discriminating against a class of female employees on the basis of their sex, and retaliating against them by threatening and harassing them for participating in a protected activity."  (*See* Pl. Ex. B, Dkt. No. 1:2.) Specifically, the EEOC found that OPRHP "did not take any serious, effective action until eight months after an internal complaint of discrimination was lodged," that Krish "made intimidating remarks to the employees who participated in the internal EEO investigation," which created an atmosphere that OPRHP "did not take discrimination complaints seriously, and that the complaint process was ineffective."  (*Id.*)  The EEOC notified the parties about its intention to remedy the situation by informal methods of conference, conciliation, and persuasion.  (*See id.*)  However, because conciliation was ultimately unsuccessful, Langsford and Bullock were notified on January 24, 2008, of their right to file a civil action under

13

Title VII.  (*See* Pl. Exs. C-D, Dkt. No. 1:2.)

On April 22, 2008, plaintiffs CSEA, Langsford, and Bullock commenced this action against OPRHP, alleging that OPRHP maintained and condoned a sexually harassing and discriminatory work environment and retaliated against its employees for complaining about such discrimination.  (*See* Compl. ¶ 42, Dkt. No. 1.)  On July 24, 2009, plaintiffs moved for partial summary judgment seeking a declaration that OPRHP failed to make prompt and effective remedial response to Langsford's internal discrimination complaint in violation of the statute.  (*See* Pl. Mem. of Law at 3, Dkt. No. 22:7.)  In addition, plaintiffs sought to permanently enjoin OPRHP from failing to make prompt and effective remedial responses to internal agency complaints and conduct that creates a hostile work environment.  (*See id.*)  On August 31, 2009, OPRHP opposed the motion and responded with a cross-motion for summary judgment dismissing the complaint in its entirety.  (*See* Dkt. No. 27.)

### III.  Standard of Review

The standard for the grant of summary judgment is well established, and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle*,

499 F. Supp.2d 192, 194-95 (N.D.N.Y. 2007).  In the fact-intensive context of Title VII, "[a] trial court must be cautious about granting summary judgment to an employer when ... intent is at issue."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.  Discussion

### A.   Right To Sue

"[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).  Accordingly, while a plaintiff's failure to obtain a right-to-sue letter is a precondition to bringing a Title VII action, it is not a jurisdictional bar.  *See Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire Dist.*, 180 F.3d 468, 474 (2d Cir. 1999).  In this spirit, a plaintiff who commences a Title VII action before receiving a right-to-sue letter may nonetheless maintain the action upon subsequent receipt of the letter. *See Blanke v. Rochester Tel. Corp.*, 36 F. Supp.2d 589, 592 n.1 (W.D.N.Y. 1999) (citation omitted); *see also Weise v. Syracuse Univ.*, 522 F.2d 397, 413 (2d Cir. 1975).

Here, CSEA obtained a right-to-sue letter on September 18, 2009,

15

after commencing suit.  (*See* Pl. Ex. A, Dkt. No. 32:2.)  While this practice

is discouraged, CSEA has cured the defect caused by its failure to receive

notice of its right to sue prior to filing this action.

## B.    Standing

Ordinarily, "a litigant must assert [her] own legal rights and interests,

and cannot rest [her] claim to relief on the legal rights or interests of third

parties."  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 715 (2d Cir. 2004).

The doctrine of associational standing carves a narrow exception to this

rule, whereby an association has standing to maintain a suit to redress its

members' injuries.  *See id.* at 714.  A union has standing if: "(a) its

members would otherwise have standing to sue in their own right; (b) the

interests it seeks to protect are germane to the organization's purpose; and

(c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit."  *Hunt v. Wash. State*

*Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  Under this three-

pronged test, it is not required that every member be aggrieved or have

standing to sue.  *See In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp.2d

7, 50 (E.D.N.Y. 2005).  However, a union lacks standing where

participation of individual members is "essential to a proper understanding

16

and resolution of [the] claims," *Harris v. McRae*, 448 U.S. 297, 322 (1980),

and the relief sought, *see Warth v. Seldin*, 422 U.S. 490, 515 (1975).

Accordingly, while an association may seek declarative, injunctive, or other

prospective relief which would inure to the entire membership, an

association "seeking to recover damages on behalf of its members lack[s]

standing because 'whatever the injury may have been suffered is peculiar

to the individual member concerned, and both the fact and extent of injury

would require individualized proof.'" *Bano*, 361 F.3d at 714 (quoting *Warth*,

422 U.S. at 515-16).  Thus, the association must demonstrate that "its

members, or any one of them, are suffering immediate or threatened injury

as a result of the challenged action ...." *Warth*, 422 U.S. at 512.  And even

where an association seeks injunctive relief, standing may still be lacking if

"the fact and extent of the injury that gives rise to the claims for injunctive

relief would require individualized proof, or where the relief requested

would require participation of individual members in the lawsuit." *Id.*

(internal quotation marks and citations omitted).

Where a court finds that an employer has engaged in an unlawful

employment practice in violation of Title VII, "it may enjoin the practice and

'order such affirmative action as may be appropriate, which may include,

17

but is not limited to, reinstatement or hiring of employees ... or any other equitable relief as the court deems appropriate.'" *United States v. Burke*, 504 U.S. 229, 238 (1992) (quoting 42 U.S.C. § 2000e-5(g)(1)), *superseded by statute on other grounds*, Small Business Protection Act of 1996, Pub. L. No. 104-188, § 1605, 110 Stat. 1838.  The Second Circuit has "repeatedly emphasized the importance of equitable relief in employment cases," especially relief in the form of reinstatement.  *Reiter v. MTA N.Y. City Transit*, 457 F.3d 224, 230 (2d Cir. 2006) (citations omitted).  As a general rule, though, a court may grant a permanent injunction only where there is irreparable injury and the legal remedies are inadequate.  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  "To establish irreparable harm, plaintiffs must demonstrate an injury that is neither remote nor speculative, but actual and imminent ... [and] one requiring a remedy of more than mere money damages."  *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (internal quotation marks and citation omitted).  Even if irreparable harm cannot be established, declaratory relief may be appropriate where an actual controversy exists and a declaration would "serve a useful purpose in clarifying or settling the legal issues involved ... [and] would finalize the

controversy and offer relief from uncertainty." *Dow Jones & Co., Inc. v*

*Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003) (citation omitted); *see also*

*Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992).  A declaratory judgment

is of particular value where the challenged action is reasonably expected to

be repeated and, due to its short duration, evades review and cannot be

fully litigated prior to the issue becoming moot.  *See Murphy v. Hunt*, 455

U.S. 478, 483 (1982) (citation omitted).

Here, CSEA frames this action as an effort to prevent OPRHP from

further failing to effectively respond and remedy the OPRHP internal

complaint procedures as it affects CSEA's female members employed by

OPRHP at Minnewaska.  However, it is undisputed that Krish no longer

holds a position at Minnewaska and plaintiffs have made no showing that

any female Minnewaska employees are currently suffering from

discriminatory practices or that OPRHP's failures have resurfaced or are

recurring.  Thus, CSEA has failed to demonstrate that any of its members

are suffering from imminent, immediate, or threatened injury.  Moreover,

while a union may have associational standing in limited circumstances

where there is evidence of ongoing discriminatory practices, *see Int'l*

*Woodworkers of Am. v. Georgia-Pacific*, 568 F.2d 64, 66-67 (8th Cir.

1977), the types of claims and injuries alleged here require individualized proof and participation by individual employees.  For these reasons, injunctive relief against OPRHP is unwarranted.

The court is not convinced that declaratory relief is warranted either. While summary declaratory judgment can be appropriate to clarify a legal issue, such as whether an employer took prompt and effective remedial action in responding to an internal complaint, the court is neither able nor willing to make such a declaration here.  The declaration plaintiffs seek requires individualized inquiry and proof.  Moreover, the challenged actions taken by OPRHP are not of the type that could evade review.  And in addition to the disputes of fact that remain regarding the promptness and effectiveness of OPRHP's response to Langsford's internal complaint, declaratory relief regarding such disputes would not finalize or settle the legal issues involved.[5]  Thus, a declaratory judgment would not serve any purpose in this matter.

Lastly, and notably, while plaintiffs' complaint requests reinstatement

_____

[5]Plaintiffs reliance on *Transp. Workers Union of Am., Local 100, AFL-CIO v. N.Y. City Transit Auth.*, 342 F. Supp.2d 160, 169 (S.D.N.Y. 2004), as an "analogous case" is ill-considered.  Whereas the union's standing in that case depended on a purely legal question, namely a facial challenge to an employer's sick leave policy, here, the issues raised are fact-intensive and specific to the aggrieved individuals.

of Langsford, Bullock, "and any other CSEA represented female employee

who may have suffered a loss of employment because of [OPRHP's]

discriminatory actions and retaliatory treatment," both Langsford and

Bullock have testified that they are not interested in reinstatement.  (*See*

Def. Ex. 8, Langsford Dep. at 111, Dkt. No. 27:9; Def. Ex. 9, Bullock Dep.

at 85, Dkt. No. 27:10.)  Yet, even if Langsford or Bullock individually assert

an interest in reinstatement, CSEA's involvement here is gratuitous as it

has not offered any evidence that there are other female employees who

resigned or were terminated from their position at Minnewaska due to

OPRHP's malfeasance who now desire reinstatement.

Accordingly, because the bases for CSEA's presence in this lawsuit

have been discounted, the court concludes that CSEA lacks standing to

pursue its claims and is therefore dismissed from this action.

**C.    Hostile Work Environment**

Under Title VII, it is "an unlawful employment practice for an

employer ... to discharge any individual, or otherwise to discriminate

against any individual with respect to [her] compensation, terms,

conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

"A hostile work environment claim requires a showing (1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).  Under the first prong, the plaintiff must demonstrate that "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.* (citations omitted).  The plaintiff must show both that the misconduct was "severe or pervasive enough to create an objectively hostile or abusive work environment" and that she "subjectively perceive[d] that environment to be abusive." *Id.*  And to "meet the threshold of severity or pervasiveness," incidents must be "sufficiently continuous and concerted" rather than episodic or isolated.  *Id.* (internal quotation marks and citation omitted).

The second prong requires that the plaintiff demonstrate a basis for imputing the misconduct to the employer.  Where the harassment is attributed to a supervisor, the court must examine "whether the

supervisor's behavior culminated in a tangible employment action against the employee." *Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004) (internal quotation marks and citation omitted).  A "tangible employment action" requires an act which the employer ratified or approved, *see Finnerty v. William H. Sadlier, Inc.*, 176 Fed. Appx. 158, 161 (2d Cir. 2006) (citation omitted), and is therefore limited to "significant change[s] in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Where no tangible employment action occurs, the employer will still be liable unless the employer provides an affirmative defense that "(a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Id.* (internal quotation marks and citations omitted).  The court may consider an employer's failure to conduct an adequate investigation or to undertake an appropriate response as evidence of discrimination or liability.  *See Sassaman v. Gamache*, 566 F.3d 307, 314-15 (2d Cir. 2009).

23

While OPRHP attempts to cast Krish's actions as merely harsh or rude, the court is satisfied that, based on all the evidence available and construing any disputed facts in Langsford and Bullock's favor, a reasonable jury could find that OPRHP, by its acts and omissions, created a hostile work environment.  Langsford and Bullock have sufficiently shown that Krish's behavior may have been so severe and pervasive as to alter the working conditions and create an abusive environment at Minnewaska. The facts illustrate an environment where Krish was permitted to insult and ridicule women, inappropriately stare at, interact, and touch women, make sexist and harassing statements, and allocate duties, positions, and privileges based on gender.  A rational factfinder could rely on these facts to find that the Minnewaska workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [Langsford and Bullock's] employment were thereby altered."  *Alfano*, 294 F.3d at 374.  Moreover, when Krish was confronted with these facts, he incredulously admitted that he treated women differently and stared at them inappropriately depending on what they were wearing.  Most disturbingly, when confronted with a particular female's complaints, Krish told OPRHP's management that he was "not getting anything out of it ...

24

[because] she's not the slickest filly in the corral."  This statement and the context in which it was made tellingly reveal both Krish's lack of remorse and OPRHP's possibly deficient response.  Thus, for purposes of OPRHP's motion for summary judgment, Langsford and Bullock have demonstrated the existence of an objectively hostile and abusive work environment and that each of them subjectively perceived the environment to be abusive and hostile.

As to imputation, Langsford and Bullock have presented genuine issues of material fact.  First, since Krish was the primary supervisor at Minnewaska, the manner in which he reorganized the positions and allocated privileges between male and female employees may have constituted a tangible employment action.  With regards to Langsford, although constructive discharge is generally not considered a tangible employment action, *see Finnerty*, 176 Fed. Appx. at 161, the manner in which OPRHP offered to reassign Langsford to another park with apparent knowledge that Langsford would resign unless something was done regarding Krish could reasonably be deemed a tangible employment action by OPRHP.  Moreover, while the court acknowledges OPRHP's assertions that Langsford and Bullock resigned for unrelated reasons or with mixed

motives, disputes of fact remain as to those assertions and whether

OPRHP condoned Krish's discriminatory behavior by failing to respond

promptly and effectively and thereby ratified Langsford and Bullock's

constructive discharge.  Regardless, even if there was no tangible

employment action, there are other genuine issues as to whether OPRHP

exercised reasonable care to prevent and correct the alleged sexual

misbehavior and whether Langsford and Bullock took ample advantage of

OPRHP's anti-discrimination procedures and the proposed mediation.

Accordingly, summary judgment on Langsford and Bullock's hostile work

environment claims would be unjustified.

**D.     Retaliation**

Title VII provides that "[i]t shall be an unlawful employment practice

for an employer to discriminate against any of his employees ... because

[she] has made a charge, testified, assisted, or participated in any manner

in an investigation, proceeding, or hearing ...."  42 U.S.C. § 2000e-3(a).

In analyzing claims of retaliation, courts apply the burden-shifting

rules first set forth in *McDonnell Douglas Corp. v. Green*, which place upon

the plaintiff the initial burden of making out a prima facie case of retaliation.

411 U.S. 792 (1973).  The Second Circuit characterizes this initial burden

as "minimal." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (citations omitted).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) [she] participated in a protected activity, (2) the defendant knew of the protected activity; (3) [she] experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action." *Jackson v. N.Y. City Transit*, 2009 WL 3287558, at *2 (2d Cir. Oct. 14, 2009) (citation omitted).  "Protected activity" includes both the filing of formal discrimination charges and informal protests such as making complaints to management.  *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).  A plaintiff can demonstrate an adverse employment action by showing "'that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  The term "adverse employment action"

27

includes discharge from employment by constructive discharge.[6]  *See Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 1996).  As to the fourth prong, "[p]roof of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant."  *See DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted).

Once a prima facie case of retaliation is established, the burden shifts to the employer to "proffer[] a legitimate, non-retaliatory reason for the challenged employment decision ...."  *Jackson*, 2009 WL 3287558, at *2.  If the employer proffers a legitimate, non-retaliatory reason for the challenged employment action, the presumption of retaliation drops out, and the employer "will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited [retaliation]."  *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.

_____

[6]"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit voluntarily."  *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996); *see also Fitzgerald v Henderson*, 251 F.3d 345, 358 (2d Cir. 1996).

2000).  The plaintiff must then present sufficient evidence to "permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation,"  *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001), and that "the prohibited factor was at least one of the motivating factors," *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation marks and citation omitted).

Here, Langsford and Bullock have each sufficiently established a prima facie case of retaliation.  First, the evidence establishes, and OPRHP concedes, that Langsford engaged in protected activity by making informal complaints to Krish and by filing a formal internal complaint with management.  The evidence also shows that Bullock made informal complaints to her supervisors and that Langsford's complaint was filed on her behalf.  As to the second and third prongs, Langsford and Bullock have demonstrated that Krish knew they each engaged in these protected activities and that he displayed a retaliatory animus towards them.  In particular, the evidence shows Krish threatened people regarding their positions, telling them, among other things, they were replaceable, that he knew who was "out to burn" him, that he laid off people who questioned his authority and decisions, and that people who go against him "pay."  Both

Langsford and Bullock experienced this animus firsthand in verbal and physical manifestations.  In addition to establishing proof of retaliatory animus, the evidence demonstrates that Langsford and Bullock suffered adverse employment actions, which the court has discussed at length above.  And even if Langsford or Bullock did not sustain an adverse employment action in the form of constructive discharge or reassignment of responsibilities,[7] Krish's behavior post-complaint combined with the manner in which OPRHP handled Langsford and Bullock's complaints "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Kessler*, 461 F.3d at 207.

It is not clear whether OPRHP has proffered a legitimate, non-retaliatory reason for its conduct; nor is it clear how OPRHP would successfully do so based on the evidence of Krish's behavior.[8]

_____

[7]The court is aware of the additional factual dispute regarding OPRHP's failure or refusal to rehire Langsford and Bullock.  While the circumstances surrounding Langsford and Bullock's attempts to seek reemployment at Minnewaska are unclear and not essential to resolving the current motions, these episodes may constitute additional adverse employment actions for retaliation purposes.

[8]Plaintiffs and defendant also engage in a debate about whether OPRHP's scrutiny of Langsford's hours and participation in off-site lecturing constituted adverse employment actions.  Presumably in an attempt to carry its burden under the *McDonnell Douglas* standard, OPRHP has provided evidence to demonstrate that this scrutiny was conducted in a legitimate, non-retaliatory manner.  However, this debate is tangential to the court's analysis.  Moreover, OPRHP's proffered rationale is insufficient to overcome Langsford and Bullock's broader prima facie case of retaliation.

Accordingly, despite its suggestions that Langsford and Bullock were not constructively discharged and were assigned responsibilities based on experience, OPRHP is not entitled to summary judgment on Langsford and Bullock's retaliation claims due to the existence of genuine issues of fact regarding OPRHP's proffered reasons, whether such reasons rebut the presumption of retaliation, and whether such reasons were pretextual.

## V. Conclusion

This case is now deemed trial ready and has been moved to the jury trial list.  The court will subsequently issue an order setting forth the trial deadlines.  If the parties seek a settlement conference, they are instructed to contact the underlying Magistrate Judge.

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that plaintiffs' motion for partial summary judgment is **DENIED**; and it is further

**ORDERED** that OPRHP's motion for summary judgment is **GRANTED** insofar as CSEA is dismissed from this action and is **DENIED** with respect to Langsford and Bullock's hostile work environment and retaliation claims; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-

31

Decision and Order to the parties.

**IT IS SO ORDERED.**

January 25, 2010
Albany, New York

United States District Court Judge